In the Matter of David L. SMITH, Individually & d/b/a Smith Motor Company, Debtor.

GEORGIA CASUALTY & SURETY COMPANY, Plaintiff,

v.

TENNILLE BANKING COMPANY, Defendant.

Bankruptcy No. 83–50368–Mac. Adv. P. No. 83–5219.

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Aug. 8, 1985.

906

Walter H. Bush, Jr. of Hall, Bloch, Garland & Meyer, Macon, Ga., for plaintiff.

John T. McGoldrick, Jr. of Martin, Snow, Grant & Napier, Macon, Ga., for defendant.

## MEMORANDUM OPINION ON COMPLAINT FOR WRONGFUL DISHONOR

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

On April 4, 1983, David L. Smith, Individually & d/b/a Smith Motor Company, Debtor, filed a petition under Chapter 7 of the United States Bankruptcy Code. On July 21, 1983, Georgia Casualty & Surety Company, Plaintiff, filed a "Complaint" against the Tennille Banking Company, Defendant.[1] In the complaint, Plaintiff alleges that Debtor purchased certain cars from Rawls Auto Auction Sales, Inc. and Perry's Auto Auction, Inc. by checks drawn on Defendant. Plaintiff asserts that Defendant wrongfully dishonored the checks. Plaintiff further asserts that Defendant's subsequent foreclosure on the cars was improper. Plaintiff seeks damages in the amount of $20,210.00 from Defendant.

On March 16, 1984, Defendant moved for summary judgment.[2] The Court denied Defendant's motion for summary judgment on April 13, 1984. In a pre-trial order filed with the Court on August 13, 1984, the parties stipulated the following issues:[3]

1. Whether Plaintiff could void any title that Debtor had in the cars, and if so, whether Defendant, who obtained its ti-

tle from Debtor, qualified as a good faith purchaser under Georgia law;

2. Whether the money Defendant loaned Debtor to purchase the cars constituted a special deposit that required Defendant to honor the checks written for the cars;

3. Whether Debtor's and Defendant's pattern or practice of paying for Debtor's car purchases constituted fraud;

4. Whether equity required Defendant to honor the checks.

Plaintiff's complaint came on for trial on October 4, 1984. In lieu of evidence, the parties filed a "Stipulation" on the day of the trial, in which the parties stipulated into evidence certain depositions, affidavits, and documents.

The Court, having considered the depositions, affidavits, and documents stipulated into evidence by the parties, and the arguments and briefs of counsel, now publishes its findings of fact and conclusions of law.

### FINDINGS OF FACT

Debtor operated Smith Motor Company as a sole proprietorship. The business was a used car business with car lots in Tennille and Sandersville, Georgia. Debtor did a substantial amount of banking with Defendant, but also banked with other local banks. Debtor maintained a special checking account with Defendant to transact the Smith Motor Company business. Debtor also had a personal checking account with Defendant.

Debtor purchased most of his inventory of cars from Rawls Auto Auction and Perry's Auto Auction. Debtor's standard practice was to attend auctions at Rawls Auto Auction and Perry's Auto Auction on a weekly basis. After he purchased cars at the auctions, he would write a check to pay for the cars. Debtor drew these checks upon the special bank account that he had with Defendant, which was in the name of

1. Plaintiff is an assignee of Rawls Auto Auction Sales, Inc. and Perry's Auto Auction, Inc.

2. The Court has jurisdiction to enter a final order in this non-core proceeding because the

parties consented to jurisdiction in this Court. 28 U.S.C.A. § 157(c) (West 1979 & Supp.1985).

3. These issues have been restated by the Court.

"Smith Motor Company Special Account." If the auction company had the certificate of title to a car at the time of purchase, upon receipt of Debtor's check it would transfer the certificate of title to Debtor and deposit the check. If the auction company did not have the certificate of title to the car, the auction company would give Debtor a bill of sale and hold Debtor's check. When the auction company received the certificate of title, it would forward the certificate of title to Debtor and deposit Debtor's check.

Debtor was able to give to the auction companies a check at the time of each purchase because of a financial arrangement between Debtor and Defendant. After Debtor purchased a car from the auction companies, he would execute a promissory note with Defendant to cover the cost of the purchase. As collateral for the loan, Defendant took a security interest in the car. Defendant deposited the loan proceeds into the special account or gave the loan proceeds directly to Debtor.

Only licensed car dealers could purchase cars at Rawls Auto Auction and Perry's Auto Auction. As a standard practice, both auction companies required a new dealer at their auctions to register. When registering, the new dealer was required to give certain information to the auction companies, including his name, his license number, and bank. Both auction companies then used this information to check the credit of the dealer. They contacted the bank listed to check on the dealer's financial status. If the bank could not be reached or if additional information was needed, the auction companies contacted other reputable auction companies with which the dealer was registered to inquire about the dealer's financial status with these auction companies. Rawls Auto Auction and Perry's Auto Auction allowed the dealer to buy and sell, and extended the dealer credit if the dealer had a good credit rating. No other credit checks occurred unless the dealer's checks were not paid or unless there were other credit problems with the dealer.

Neither Rawls Auto Auction nor Perry's Auto Auction positively recalled having performed the standard credit check on Debtor. Both had done business for many years with Debtor's father, the previous owner of Smith Motor Company. Debtor's father had a good credit history with the auction companies. When Debtor took over his father's dealership, Rawls Auto Auction and Perry's Auto Auction extended credit to Debtor based upon his father's reputation. Upon this basis, both companies accepted checks drawn upon the Smith Motor Company special account.

During late February and early March of 1983, Debtor purchased three cars from Rawls Auto Auction and two cars from Perry's Auto Auction. In each instance, Debtor paid the auction companies with a check for the purchase price drawn upon Smith Motor Company's special account. Afterwards, Debtor, and evidently in one instance his authorized agent, returned to Tennille and executed promissory notes to cover the purchase price of the cars. As part of the transactions, Debtor executed security agreements, giving Defendant a security interest in the newly purchased cars. On four of the cars, Defendant deposited the loan proceeds in Debtor's special account; on the fifth, Defendant gave Debtor a check.

During the first part of March, Defendant paid some checks that Debtor had drawn on his special account even though there were insufficient funds in the account. Generally when a customer's account had insufficient funds, Defendant would refuse to honor such checks and would send the checks back to the Federal Reserve System without payment. Bank officers could override this standard practice and elect to pay the checks. Bank officers elected to pay some of Smith Motor Company's checks, including some issued to Rawls Auto Auction and Perry's Auto Auction, by this procedure. At the time of such payments, neither Rawls Auto Auction nor Perry's Auto Auction had any knowledge that Defendant was paying them from an account that was overdrawn. Defendant, however, knew that it was paying Rawls Auto Auction and Perry's Auto Auction with such checks, and it also knew

that Rawls Auto Auction and Perry's Auto Auction were two of the auction companies from which Debtor bought his cars.

On March 21, 1983, Defendant placed a "hold" on the Smith Motor Company special account because Defendant believed Debtor to be involved in a check-kiting scheme. Defendant took no formal action against Debtor, but did discuss the matter with Debtor. After March 21, 1983, Rawls Auto Auction and Perry's Auto Auction presented to Defendant the five checks in question in this adversary proceeding. The checks totaled $20,210.00. The delay in presentment occurred because Rawls Auto Auction and Perry's Auto Auction, following their standard practice, presented the checks for payment only after Debtor was given the certificates of title. When the auction companies presented the checks, Defendant refused to honor them. During this time, however, Defendant honored other checks drawn by Debtor against insufficient funds.

Debtor subsequently filed for relief under Chapter 7 of the United States Bankruptcy Code. Defendant, holding a valid security interest in the five cars, obtained an abandonment from the trustee of Debtor's bankruptcy estate and sold the cars.

Plaintiff, being obligated, was called upon to pay the $20,210.00 to Rawls Auto Auction and Perry's Auto Auction and took a subrogation agreement from them.

### CONCLUSIONS OF LAW

Plaintiff first contends that no title to the cars passed to either Debtor or Defendant because the auction companies received no consideration. Section 11–2–403 of the Georgia Code deals with the transfer of goods. It provides:

A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. *When goods have been delivered under a transaction of* *purchase the purchaser has such power even though:*

. . . .

(b) *The delivery was in exchange for a check which is later dishonored;* ...

O.C.G.A. § 11–2–403(1)(b) (Michie 1982) (emphasis added). Under this code section, Debtor qualifies as a purchaser of goods even though Defendant dishonored the five checks with which Debtor paid the auction companies. Debtor, as the purchaser, obtained a voidable title from the auction companies. *See Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1328 (5th Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

The code section further provides that "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value." O.C.G.A. § 11–2–403(1) (Michie 1982). Under this code section, the interest of a good faith purchaser is protected. If Defendant meets the requirements of a "good faith purchaser for value," then it acquired good title to the cars from Debtor.

The Georgia Code defines "good faith" as meaning "honesty in fact in the conduct or transaction concerned." O.C.G.A. § 11–1–201(19) (Michie 1982 & Supp.1985). The court in *Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1238 (5th Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), considered several factors in determining whether the secured party in that case took a security agreement in good faith under section 1–201(9) of the Uniform Commercial Code. The factors included whether the security agreement was the product of bad faith, whether the security agreement was taken to defeat the original seller's interest, and whether the secured party retained control over the debtor. 526 F.2d at 1243. In this case, the record reveals no evidence that Defendant took the security interest in bad faith. Plaintiff has not shown that Defendant took the security interest for the purpose of defeating Plaintiff's interest. Instead, the evidence shows that Defendant took the security interest in the cars as part of a

financing arrangement to pay for the cars. Furthermore, Defendant retained no control over Debtor once the loans were made. Debtor could use the loan proceeds as he desired.

■ Plaintiff argues that it is significant that when Defendant loaned Debtor money, Defendant knew Debtor was borrowing the money to pay for the purchase of cars from the auction companies. Plaintiff argues that this knowledge created a duty which required Defendant to honor the checks payable to the auction companies. Defendant's knowledge that Debtor owed the auction companies money for the cars does not by itself affect Defendant's good faith status under article two. *Shell Oil Co. v. Mills Oil Co.*, 717 F.2d 208, 212–14 (5th Cir.1983). *See also In re Samuels & Co.*, 526 F.2d at 1243–44. The definition of good faith under article two does not require that Defendant lack knowledge of the auction companies' claims before it can qualify as a good faith purchaser. 526 F.2d at 1243–44.

In light of the evidence presented, Defendant's knowledge that Debtor owed money to the auction companies for the cars does not require a finding that Defendant acted in bad faith. In the past, Debtor had covered the cost of the cars he purchased from the auction companies with the loan proceeds he received from Defendant. Debtor was free to use the loan proceeds as he wished because there was no agreement that the proceeds should only be used to pay the auction companies. Debtor could have used funds other than the loan proceeds to cover the car purchases. In the absence of any evidence that Defendant acted in bad faith when it took the security interest, Defendant's knowledge of the auction companies' claim is not sufficient by itself to show that Defendant acted in bad

faith. Defendant, therefore, meets the code's definition of good faith.

■ Defendant also meets the code's definition of "purchaser." The Georgia Code broadly defines the term purchaser. The definition includes a purchaser who takes by sale, mortgage, lien, or any other voluntary transaction creating an interest in property. O.C.G.A. § 11–1–201(32), (33) (Michie 1982 & Supp.1985). The definition of purchaser is "broad enough to include an Article Nine secured party." *In re Samuels & Co.*, 526 F.2d at 1242. Defendant qualifies as a purchaser because it took a valid article nine security interest in the cars. *See* O.C.G.A. § 11–9–203 (Michie 1982).

■ The evidence shows that Defendant gave "value" for its interest as the term is defined in Georgia Code section 11–1–201(44). O.C.G.A. § 11–1–201(44) (Michie 1982 & Supp.1985).[4] Defendant loaned Debtor money equal to the purchase price of the cars. The evidence shows that Defendant either deposited the loan proceeds directly into Debtor's special account or gave Debtor a check.

■ Defendant, therefore, meets the requirement of a "good faith purchaser for value" under section 11–2–403(1). Debtor, having a voidable title, transferred to Defendant good title to the cars. O.C.G.A. § 11–2–403(1) (Michie 1982). Defendant has priority over any rights that Plaintiff has in the cars because Defendant had a valid security interest in the cars and was a good faith purchaser for value.

■ Plaintiff also contends that Defendant had an affirmative duty to honor the checks drawn upon Debtor's special account because the money deposited in this account constituted a special deposit in

---

4. The code provides this definition:

[A] person gives "value" for rights if he acquires them:

(a) In return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or

(b) As security for or in total or partial satisfaction of a preexisting claim; or

(c) By accepting delivery pursuant to a preexisting contract for purchase; or

(d) Generally, in return for any consideration sufficient to support a simple contract. O.C.G.A. § 11–1–201(44) (Michie 1982 & Supp. 1985).

favor of the auction companies. In Georgia, a deposit is presumed to be a general deposit. *Williams v. Bennett*, 158 Ga. 488, 494, 123 S.E. 683, 685 (1924). The Georgia Code provides that "[a] check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it." O.C.G.A. § 11–3–409(1) (Michie 1982). Defendant owed no affirmative duty to the auction companies to pay the checks unless it accepted the checks[5] or special circumstances warranted payment, such as a special deposit. *See Stewart v. Citizens & Southern National Bank*, 138 Ga.App. 209, 210, 225 S.E.2d 761, 762 (1976); *Sabin Meyer Regional Sales Corp. v. Citizens Bank*, 502 F.Supp. 557, 559–60 (N.D.Ga.1980).

█ In order to show that Defendant had an affirmative duty to pay the checks, Plaintiff must show that the deposits were special deposits. A special deposit is a bailment, which implies a setting apart of the special money to be itself returned on demand. *Schofield Manufacturing Co. v. Cochran*, 119 Ga. 901, 903, 47 S.E. 208, 209 (1904). To create a special deposit, special instructions or an agreement between a bank and its depositor to use the funds for a special purpose is necessary. *See generally Schofield Manufacturing*, 119 Ga. 901, 47 S.E. 208 (1904); *Georgia Bank & Trust v. Hadarits*, 111 Ga.App. 195, 141 S.E.2d 172, *rev'd on other grounds*, 221 Ga. 125, 143 S.E.2d 627 (1965).

Debtor's account with Defendant was labeled as the "Smith Motor Company Special Account." The evidence shows that this account was set up for Debtor to transact the business of Smith Motor Company. Debtor and Defendant had no agreement that only the auction companies could be paid from that account, or that the auction companies had any right to a specific portion of the Smith Motor Company special account.

█ Plaintiff asserts that Defendant knew that its loans to Debtor were to be used to pay the auction companies, and that this knowledge supports a finding that these deposits constituted a special deposit for the benefit of the auction companies. In *Schofield Manufacturing*, the court found that a bank president knew that a deposit was made solely to release yarn which the plaintiff had purchased. The court found that this knowledge alone was not sufficient to change the characterization of the deposit absent special instructions regarding the deposit. The court, therefore, refused to characterize the deposit as a special deposit. 119 Ga. at 904, 47 S.E. at 209. Defendant's knowledge regarding Debtor's use of the loan proceeds does not change the characterization of the deposits from general to special because there was no special agreement between the parties. Defendant, therefore, did not have an affirmative duty to honor the checks.

█ Plaintiff also contends that an affirmative duty to honor the checks arose because on previous occasions, Defendant honored checks drawn on the Smith Motor Company account when the account had insufficient funds. Plaintiff argues that this established a pattern or practice of paying such checks. The Georgia Code recognizes the term "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." O.C.G.A. § 11–1–205(1) (Michie 1982). A prior course of dealing or pattern or practice of dealing is not binding on a party unless there is first a contract. *White Lumber Sales, Inc. v. C. Brinson Lamb & Sons Lumber Co.*, 121 Ga.App. 702, 703, 175 S.E.2d 81, 82 (1970). *See also Galaxy Boat Manufacturing Co. v. East End State Bank*, 641 S.W.2d 584, 587 (Tex. Ct.App.1982). Plaintiff has not presented

---

5. The record shows that Defendant did not accept the checks, but instead dishonored them as provided for in O.C.G.A. § 11–3–507(1) (Michie 1982). Defendant returned the checks before its midnight deadline. O.C.G.A. § 11–4–104(1)(h) (Michie 1982). *See also* O.C.G.A. § 11–3–102(3) and § 11–4–301(4) (Michie 1982).

any evidence of a contract between Defendant and the auction companies concerning the payment of funds to the auction companies from Debtor's special account. *See generally* O.C.G.A. § 13–3–1 (Michie 1982). Without first proving an underlying contract, Defendant had no affirmative duty to honor the checks under a pattern or practice theory.

Plaintiff also contends that Defendant's payment of Debtor's checks when the account had insufficient funds constituted fraud because such payment misled the auction companies about Debtor's credit worthiness. In Georgia, the elements necessary to establish fraud are:

(1) That the defendant made the representations.

(2) That at the time he knew they were false (or what the law regards as the equivalent of knowledge).

(3) That he made them with the intention and purpose of deceiving the plaintiff.

(4) That the plaintiff relied upon such representations.

(5) That the plaintiff sustained the alleged loss and damage as the proximate result of their having been made.

*McLendon v. Galloway*, 216 Ga. 261, 263, 116 S.E.2d 208, 211 (1960). *See* O.C.G.A. § 51–6–1 and § 51–6–2 (Michie 1982). Plaintiff must show that the auction companies relied on a misrepresentation of Defendant and were injured as a result of their reliance. *Hannah v. Belger*, 436 F.2d 96, 97 (5th Cir.1971). Plaintiff has failed to prove these elements. The evidence shows that the auction companies relied upon the credit history of Debtor's father in extending credit to Debtor. The auction companies had no knowledge that Defendant paid Smith Motor Company checks when the special account had insufficient funds until

after Defendant dishonored the five checks at issue in this adversary proceeding. The auction companies, therefore, did not rely upon any representation of Defendant. Plaintiff also has not proven that Defendant made misrepresentations or that it had the intent to deceive the auction companies.[6] Plaintiff, therefore, has failed to prove that Defendant acted fraudulently.

In its last count, Plaintiff contends that Defendant should be equitably estopped from denying that it has an obligation to honor the checks drawn on Debtor's special account. Estoppel is used to prevent a party from denying a representation that another party accepted and reasonably acted upon and which led to subsequent injury. *Sabin Meyer Regional Sales Corp. v. Citizens Bank*, 502 F.Supp. 557, 560 (N.D.Ga.1980). Plaintiff, as the party asserting estoppel, has the burden of establishing all of the elements necessary to constitute estoppel.[7] *Bennett v. Davis*, 201 Ga. 58, 63, 39 S.E.2d 3, 7 (1946). Plaintiff also must prove that it acted in good faith and exercised reasonable diligence, otherwise, no equity will arise in its favor. *Tybrisa Co. v. Tybeeland, Inc.*, 220 Ga. 442, 445, 139 S.E.2d 302, 305 (1964).

Plaintiff has not presented evidence in this case to show that Defendant made any intentional misrepresentations to the auction companies which caused the auction companies to change their positions to their detriment. If there is estoppel, it must rest upon Defendant's silence concerning Debtor's financial affairs. If silence is relied upon, there must be a right and a duty for the party to speak before the party's failure to speak will operate as estoppel. *Tybrisa*, 220 Ga. at 445, 139 S.E.2d at 305. Absent inquiry by the auc-

---

**6.** Defendant's payment of checks when the special account had insufficient funds does not prove that Defendant had an intent to deceive the auction companies. A bank has the right to pay a check drawn on a customer's account even if it creates an overdraft. O.C.G.A. § 11–4–401(1) (Michie 1982).

**7.** The necessary elements are: (1) a misrepresentation or concealment of fact; (2) the party making the misrepresentation or concealment

must have knowledge of his actions; (3) the party alleging estoppel must be ignorant of the truth; (4) the misrepresentation or concealment must be intentional; (5) the party alleging estoppel must have been induced to action by the conduct of the other; and (6) as a result of such reliance, the party alleging estoppel must change his position detrimentally. *Bennett v. Davis*, 201 Ga. 58, 63, 39 S.E.2d 3, 7 (1946). *See also* O.C.G.A. § 24–4–27 (Michie 1982).

tion companies, Defendant had no duty to disclose Debtor's financial status to the auction companies. Because Defendant had no duty to disclose Debtor's financial status to the auction companies, any reliance by the auction companies on Defendant's silence was unjustified. Plaintiff also has not proven that the auction companies acted with reasonable diligence. Instead of performing their standard credit checks on Debtor, the auction companies relied upon the credit history of Debtor's father. Plaintiff, therefore, has not proven that Defendant should be equitably estopped from dishonoring the checks.

Accordingly, the Court will deny the relief sought by Plaintiff.